This is our third case in the morning, Gillespie Community Unit School District v. Union Pacific and the subsidence fund for the appellant, Mr. Levenston, for the appellee, Mr. Thomas, for TKU. You may proceed. Thank you very much, Your Honor. The circuit court erred in granting summary judgment for the plaintiff on count five. It based its ruling on the 2012 Rule 23 order, pretty much exclusively. And while that order held on a motion to dismiss record that the allegations in the complaint, if proven, could make a submissible case, it did not make dispositive final rulings. Three years later, after remand and extensive litigation on discovery, a fact record is now developed on the central issue with respect to count five. And that is the intent of that September 14, 1956 resolution. Now it is true that the Rule 23 order said that that resolution was unambiguous. It based that conclusion on some research into the mists of time in terms of the meaning of statutes of limitations. But there was really nothing to suggest that that very narrow technical meaning of statutes of limitations is what the corporations intended when they drafted their resolution. As the Diaz case teaches us, legal documents are sui generis. And the role of court should be to enforce the intent of the parties. In so doing, it's important to look to the different factual contexts in which these various documents arise. Here, the court was indeed puzzled by the question of why a corporation, a public corporation, would choose perpetual risk, as the action was termed, over certain safety. And that question indeed prompted a dissent from the court. But as paragraph 92 of the Rule 23 order made clear, the court was presuming that legal counsel for CNW and the Superior Coal Company realized the difference between statutes of limitations and a survival statute. In fact, we're back before you today with a factual record that demonstrates, in fact, quite the opposite. The author of the resolution, counsel for the companies, Nelson Trotman, wrote a memorandum of law, which still exists and was uncovered and stipulated, too, into evidence. And in that memorandum of law, he called Section 94 of the Business Corporations Act, the Illinois statute of limitations on suits against the dissolved corporation. Not only does his use of the term statute of limitations with respect to Section 94 in the memo show that when he drafted the word subject to applicable statutes of limitations, that he intended to include Section 94. But when you read this memo, you see that the entire memo is really directed towards researching the question of whether it was necessary to assume the then current liabilities of Superior Coal in order to assure that that two-year statute would start running. And at the end of the memo, after some lengthy discussion, he concludes that the safe course of action is to assume all the liabilities to make sure that that two-year period starts to run. Now, if Mr. Trotman was wrong or incorrect in his use of the term statute of limitations in a generic sense to include 94, he is certainly not alone in that, making that mistake. The first district did this in 1942 in the Sarales v. Fagerberg case, and other courts have done it, the federal courts in New Jersey addressing the Lowe's case. I did some research, and the fact is that I could find no cases before 1956 and 57 when this corporate dissolution took place, which actually called Section 94 a survival statute. The earliest case I could find that did that was People v. Parker in 1964. I do not believe that O'Neill called it a survival statute. I do not believe that Dukes, the case that this court used and relied upon in analyzing that, called it a survival statute. So, I think that this memorandum makes very clear that it was the intent of the corporations to invoke the protections of Section 94. If more evidence were necessary, I don't think it is, there is a list at our brief at 35 and 36 that includes additional evidence. Among that additional evidence is the uncontradicted lexicographic study of usage of the term statute of limitations in that era of the 1950s and before. We have similarly amassed uses of the term statute of limitations in the Illinois State Bar Guide to Statutes of Limitation as late as 2010. Although this court noted the caveat that comes with that, as it always does in these ISBA publications that you need to do your own research, I think the important point is that members of the bar deemed experts on this felt that their colleagues at the bar, if they were going looking for a discussion of Section 94, would probably look under the term statute of limitations. Indeed, the official comments when the Business Corporation Act was modified in 1983 and 94 became Section 12.80 also used the term statute of limitations. In addition to that, we have the business practice evidence talking about how a board of directors of a public corporation would not gratuitously assume such unending liability. There is, as well, the accounting practice evidence. There really was nothing, no reason that the company would have gratuitously assumed any of this evidence. The importance of this evidence also is that it takes this case out of the purview of the cases of Illinois Banker's Life and the Hindu Incense case that talk about whether a husband can collect a wife's life insurance after murdering her, and although there was nothing in the contract, the court said, well, there are obvious policy reasons why we're not going to let this happen. That's quite a different matter. The other case, Hindu Incense, involved interpreting a lease obligation. It's important to note that the Supreme Court in that case said that if the parties had wanted to override the general practice of the law here, they could do so simply by expressing a different intention. The language subject to applicable statute of limitations, we believe, is precisely the expression of that different intention here. What about this as a question? The question is, Section 94 is the issue. Is it a statute of limitations is really the argument you're making. What about the argument or the observation that it's not a statute of limitations in the plain and ordinary sense of that term, because instead of imposing time limits on a pre-existing right of action, which is normally what statute of limitations do, Section 94 expands the time in which to sue a corporation by keeping the corporation alive for two years after the issuance of a certificate of dissolution. Right. I think that that derives from the Dukes case, and Dukes was right in a sense and wrong in a sense. In terms of statutory interpretation, when Dukes was addressing the question whether the non-suit extension in the Limitations Act, that amendment applied to the Section 94 predecessor, it looked to Bishop and the Wrongful Death Act, which also had a time limit in it. And in Bishop, the Supreme Court said, well, that time limit doesn't fall within the Limitations Act, and it's not modified by this non-suit. And Dukes said, we adopt that rationale. The difficulty there is that Bishop was addressing the Wrongful Death Act, and the Wrongful Death Act created a cause of action where no cause of action existed before, none. And it was unique in that sense, and this is not a parallel to the survival statute, if you call it that, of 94. 94 does not create any causes of action. 94, like if you go back in history, the Wrongful Death Act was the Injuries Act in 1853, and then there was the Survival Act of 1874. And it's more parallel to the Survival Act of 1874 in that it continued, it made causes of action that existed but abated upon the death of a person or a corporation continue. But as the Survival Act of 1874 did, it relied upon the existing statute of limitations, although it superimposed certain additional limitations on that. And that's really what's going on here. Well, what would be the situation? Maybe another way to look at it is to ask this question. Let's assume there was no Section 94 at all. What would be the situation when the corporation is out? The cause of action would abate, is what the common law said. It would go away. So what's happened here is you've not created a cause of action like they did with the Wrongful Death Act, where there was none. What you have done is you've given a grace period of additional time in which to assert it. But as the Supreme Court made clear in the Pilot case, which is actually subsequent to the Rule 23 order here, that cause of action had to have accrued during the existence of the corporation, whether it was filed during the existence or after, it still had to accrue. Causes of action that accrued after the dissolution but during that grace period were not preserved. That would have essentially been closer to the Wrongful Death Act. So in other words, and P. Tom versus Swanson is an example of this. You have a cause of action against a corporation that arises before the corporation dissolves. The corporation then dissolves, and you now have two years under that Dissolution Act, under Section 94, to bring your cause of action, unless the cause of action that has its own statute of limitations that cuts it short. In other words, if you had a one-year cause of action that arose two years before the dissolution, or a year and a half before the dissolution, you don't get the two years full. That cause of action ends with its own statute of limitations. So this is really not a situation where a time limit is built into a whole new cause of action. This is, in a sense, putting an end point, as the Michigan Condo Court recently said, on the ability to bring a cause of action against a dissolved corporation. So I think it really is conceptually different from the Wrongful Death Act, and I do think in that sense it requires a different treatment. So from that perspective, then, the statute of limitations, regardless of that, in the end what's clear is, what the evidence is clear is, that the intent of the drafter and the intent of the corporations was to obtain the protection of this. So whether they used the term wrong or not, I think the comparable case here would be Batiste, the Illinois Supreme Court case in which a settling party used the term release mistakenly because they did not mean to release all of their claims against all the parties. And the court said, well, that doesn't make sense. And just like in this case, releasing or foregoing the protection of Section 94 wouldn't make sense. And so the court said, we have to look at the circumstances surrounding the document and reinterpret it in a way that makes sense and in a way that gives effect to the intent of the parties. And because of this factual record, I think the prudential doctrine of law of the case does not bar this court from taking a closer look in the context of the factual record and readdressing the corporate resolution. And when it does, the evidence is clear that the corporation did, in fact, choose certain safety over perpetual risk and that at the end of two years, there was no longer an ability to sue either Superior Coal or its shareholder, Chicago Northwestern, on causes of action against the coal company based on coal mining. Alternatively, if this court is not inclined to revisit its ruling on statute of limitations, the clear intent in the record suggests that reformation should be permitted here, should be awarded because it is very clear that the intent of the resolution was to invoke the protection of Section 94. And so this court should do so, should correct that resolution to read accordingly. And the question of whether it's a matter of law or fact really doesn't matter. As the Barkhausen case, the Illinois Supreme Court said, if there's a mistaken use of words, we have the power to correct it whether that mistake is classified as one of fact or one of law. This court in the State of Hearst case did that with what I guess would be a mistake of law, changing a document that said tenancy in common to joint tenancy with rights of survivorship where it was clear from the surrounding records that that was in fact what the parties had intended. If you have any other questions on that, I am happy to answer them. Otherwise, I would like to address for a moment our appeal on the affirmative defenses. If for any reason one of the causes of action survives, then we do think that you should affirm the trial court's ruling on direct participation and altered ego. But if they do survive, I think the law is now such that we should be permitted to try before a jury our affirmative defenses of intervening clause, comparative fault, and assumption of risk. I think the court's summary judgment against us was based on a misunderstanding of the real meaning of the word absolute liability that was defined in the Restatement of Firsts of Courts, Section 820, as meaning that the defense cannot avoid liability by proving it did nothing wrong. It did state of the art mining. But it doesn't have anything to do with whether you can assert a defense based on the plaintiff's conduct. And indeed, in 1880 in Wilms v. Jess, the Illinois Supreme Court said that you can. If the plaintiff had built a building on the property and the weight of that building had contributed to the cause of the subsidence, that was contributive negligence. The court didn't address any other opportunities or other types of potential conduct that would be an affirmative defense, but it didn't say that there could be none. And 100 years later, in 1979, Restatement Second came out, 820. And the Restatement Second had changed the words absolute liability to strict liability. And strict liability terms that courts today are very familiar with. And I think that's why they made that change. And, well, I'll just say, I'll refer you to the Statute 21116, which talks about comparative fault in all the variety of affirmative defenses. And that will teach you how affirmative defenses should survive. Thank you, Counsel. Thank you, Your Honors. Thomas Berticchio for the School District Appellee and Cross-Appellant. In April 2012, this court held that the September 1956 resolution was an unambiguous document, assuming liabilities, making no reference to the Survival Act. That decision was the law of the case. The Illinois Supreme Court tells us that concerning the law of the case, this is in the PSL realty case, the court said, quote, and these are our facts. Where the appellate court on the first appeal to it announces a particular view of the law governing the case and reverses and remands the case for further proceedings, if the case is again brought before such court for review, the former decision is binding on the court making it and questions decided and determined by it on the first appeal are not open for reconsideration on the second appeal. Is that true even in the face of a spirited and brilliant dissent? Your Honor, I believe it is. Just checking. There's two exceptions. If the Supreme Court speaks to the issue in the interim, that does apply. Or if the case was decided and it was palpably erroneous and the matter was remanded to the trial court on all issues, including the one at issue, that doesn't apply. Even in the face of a spirited dissent, the decision was well- And brilliant. And brilliant. Well-reasoned, thorough analysis, and just as importantly and perhaps more importantly, the issue was one of law. The case was not remanded to have the trial court decide anew the question of law. Does this unambiguous document refer to the Survival Act? That question of law had been decided. Now Union Pacific says, well, we didn't get a chance to argue that point the first time. They did. At page 22 of our opening brief, we put out a chart for your honors. And you can see that the cases cited in 2015 were the same cases cited in 2011. More to the point, Union Pacific told this court when responding to the petition for rehearing after the 2011 decision, quote, the central issue throughout the life of this case has been whether the phrase, subject to applicable statute of limitations in the resolution bars the school district's claims. It is this ultimate dispositive issue, then, that has been amply vetted by the parties, the trial court, and this court. The arguments were made before. They were rejected before. Union Pacific says, yes, but now we have some evidence. We have this extrinsic evidence. This court made very clear when the document is unambiguous, it's interpreted by the four corners. Extrinsic evidence does not come in. And there's nothing new about that analysis. The Illinois Supreme Court has told us long, long ago that, and I'm quoting the Rakowski case, where a written agreement is clear and explicit, the court must enforce the agreement as written, both the meaning of the instrument and the intention of the parties must be gathered from the face of the document without assistance, parole evidence, or any extrinsic aids. What the parties to the written document have understood as to the meaning of the language is not admissible. Not admissible. Union Pacific agrees. They told this court in 2011, quote, courts regularly read words in contracts and other instruments to decide what they mean and resort to extrinsic evidence only when the meaning is ambiguous. Now, in the reply brief, in this appeal, and then again today, we're hearing an argument from Union Pacific, well, you should look at the document and consider other evidence to see if there is a latent ambiguity. That's what the Diaz case said. We heard about the Diaz case today. And I believe there were two or three older second district cases cited, and one first district case cited to the court saying, look at all this other stuff. Let's see if there's a latent ambiguity. The most recent decisions from the second district and the first district, this court has never accepted the latent ambiguity analysis. But even the first district and the second district, their most recent opinions, in the first, it's Continental Casualty versus Mid-States, 2014, Illinois Appellate First, 133090. The court said, we will not consider extrinsic evidence to determine if a latent ambiguity exists. The four corners rule of contract interpretation remains the law in Illinois. That's the most recent first district case. Second district, same thing. In the River's Edge case, 353, Illinois Appellate Third, at 880, the court said, after discussing the Illinois Supreme Court's rule of four corners, told, quote, after the Supreme Court has declared the law with respect to a specific issue, this court must follow that law because only the Supreme Court has authority to overrule or modify its decision. Accordingly, we employ the four corners approach. The Supreme Court tells us the four corners approach. Union Pacific cites other cases, though. The Vulcan Materials case, the Aguilera case, in which they tell this court, well, in those cases, the court said it could reconsider the issue on the second appeal. True, those cases dealt with factual disputes. The facts upon remand were different. The factual issue that this court decided in the first appeal. In our case, the issue decided was one of law, one of absolute law. The Supreme Court tells us when it's unambiguous, you don't look to extrinsic evidence. Even the Vulcan case that Union Pacific relies upon said, under the law of the case doctrine, determinations of law made by an appellate court are binding on remand. In a subsequent appeal to the appellate court, the issue's been decided. Reformation. Union Pacific filed a brief with the court saying, we want the courts to overturn the finding of summary judgment on reformation on the counterclaim. Nowhere within the brief was there reference to the elements of the claim. The elements of the claim for reformation based upon mutual mistake. Instead it said, quote, this is to the trial court, the fourth district's order created the need for reformation, close quote. Well, it wasn't this court's order that created the need for reformation. It's the mutual mistake of the parties when dealing with the documents. And the courts in this state say, and the Illinois Supreme Court leads the way, of course, that if you're going to sue for reformation, a mutual mistake, you have to show by clear and convincing evidence, three things, that the parties intended to say a certain thing and by their mistake said another. Second, that the mistake was mutual. Third, that the mistake is one of fact, not of law. Union Pacific failed to come forward with evidence on any of the three to show that there was a question of fact regarding the reformation claim. Summary judgment, therefore, was appropriate. As to the first, was there a mistake? Their corporate representative witness, designated to testify on this specific issue, conceded there was no mistake. The witness, the resolution speaks for itself and I think we've gone over that. Question, let me ask you this, was there a mistake in the resolution? Answer, no. That's a deliberate, clear, unambiguous admission that is binding on Union Pacific. But there was more. Each of their experts testified. Was there a mistake? No. Was there a mistake? No. Their counsel at summary judgment from the court, so there was no mistake in the resolution. It was written just as he wanted to write it at that time. Counsel, it was. These are admissions that are binding on Union Pacific. There was no mistake and there was no question of fact regarding the mistake. The first element failed. The second element, was there a mutual mistake? Mutual between Chicago Northwestern and Superior Coal. Union Pacific didn't even plead in their counterclaim that Superior Coal made a mistake. And as the gray court tells us, quote, proof without pleading is as defective as pleading without proof. That should end the matter right there. They did not even plead Superior Coal was mistaken. What of the proof? That wasn't there either. There's no evidence in this record that the board of directors of Superior Coal ever even saw the resolution. None. At that time, there was no overlap in the boards of directors. The board of directors of Superior Coal were different, completely different, than the board of directors for Chicago and Northwestern. Union Pacific's corporate representative witness and corporate governance witness admitted that the documents didn't support that Superior Coal had a mistake in the belief. There's nothing on that. There's nothing on the issue to prove by clear and convincing evidence that there was a mutual mistake shared by Superior Coal. The mistake was one of law, not of fact. Union Pacific doesn't even contest that issue. Instead, and we heard it today, they cite to the Barkhausen case from the Illinois Supreme Court and this court's case in Hearst, which relied on Barkhausen. But what did Barkhausen say? Well, it said, quote, if it is clearly shown the parties in their dealings with each other have acted under a common mistake of law, equity will afford redress. Clearly shown common mistake of law. They're trying to reform an instrument 60 years later. All the participants are long gone. There's no testimony. And we've already shown that with regard to Superior Coal, there's no evidence of any mistake whatsoever. But what of Chicago and Northwestern? The record was undisputed that on September 14, 1956, the day of Chicago and Northwestern's Board of Directors meeting, they had two documents before them. They had a memorandum from their accountant, Arthur Anderson, and they had a report from their general counsel, Mr. Hastings. Significantly, they did not have before them what's been referred to as the Trotman Memorandum. Indeed, Union Pacific's own experts conceded that after reviewing all of the discovery and all of the documents, there's no evidence that the Trotman Memorandum ever went to anybody. It wasn't sent to anyone. No one was copied on it. And there's zero evidence it was before the Board of Directors. They had two documents in front of them. The minutes of the board meetings make that clear. What do those two documents say? The Hastings report says, as appears from the attached memorandum prepared by Arthur Anderson, the advantages from the tax standpoint outweigh any possible tax disadvantage. It is our recommendation that the Superior Coal Company be dissolved and its assets be transferred to Chicago and Northwestern, and the railway company assume such liabilities as cannot be fully liquidated prior to dissolution. Assume the liabilities, not a word about limitations, not a word, certainly, about the survival statute. That's what they had in front of them. And what did the Anderson Memorandum say? Quote, the liquidation of Superior Coal into the Northwestern prior to the sale of the coal lands would be governed by the provisions of the Internal Revenue Code. The basis of the assets and liabilities in the hands of Superior will carry to Chicago and Northwestern. The liabilities and the assets will carry to Chicago and Northwestern. No mention of limitations, no mention of the survival act. The only documents before them said, we recommend that you assume the assets and liabilities. Those were what the documents said. There was no, going back to Barkhausen, true, none, zero, that the common understanding of the parties was that there was a mistake. It follows then that summary judgment on count five was appropriate for the school district. Because this court had already determined as a matter of law that it was an unambiguous assumption of liabilities. From there, the undisputed facts relating to the corporate transactions that followed the 1956 dissolution and the subsidence event led to summary judgment. On that issue, there's one note of interest regarding Union Pacific's brief. They take the position in their brief that, well, the school district must have agreed that we had to uncover all this evidence to find out the real meaning. Because look at all the discovery they propounded. Well, the discovery was propounded on the Reformation counterclaim. That was required once Reformation counterclaims surfaced. Had that not surfaced, there would have been no need for discovery regarding the resolution of language this court had already decided. The affirmative defenses. We did not hear in Union Pacific's opening brief, and we didn't hear it today, the undisputed facts, the most critical undisputed fact regarding the affirmative defenses. All three experts that testified, including David Newman, Union Pacific's professional engineer, testified that, and this is Mr. Newman's language, quote, subsidence would have occurred irrespective of what was on the surface. It would have occurred irrespective of the school district doing anything. That led to an inability of Union Pacific to show causation on its affirmative defenses. The Supreme Court tells us in the Nolan case, when determining cause and fact, Illinois courts focus on two alternative tests. The traditional but-for test, where a party's conduct is not a cause of the event if the event would have occurred without it. And the substantial factor test, where the party's conduct is said to be the cause of an event if it was a material element and a substantial factor in bringing the event about. The undisputed evidence was that the school district's conduct had no impact on the cause of the event. Union Pacific's own expert conceded the event would have occurred regardless, irrespective, his word, of what the school district built on the land. Because of that, Union Pacific could not prove, and there was no question of fact on the issue, of either but-for cause or substantial factor cause. There wasn't a factor at all. Everyone agreed. As a result, they couldn't show causation on their affirmative defenses. There was also a problem. Beyond that causation issue, because it's an absolute liability claim, Union Pacific had to prove sole cause, because only then would comparative negligence trigger. Sole cause. The evidence was undisputed that it was not the sole cause. We've cited to you multiple cases of the injunctions. The Illinois Supreme Court said, quote, It is elementary that contributory negligence, a concept of the law of negligence, is not an available defense against one seeking to enforce an absolute liability. The Baker case says the same. The Marquette Mining case from the Federal District Court says the same. Sole cause or the absolute liability defense does not exist with regard to the conduct of the plaintiff. Now, Union Pacific says, well, but it's not really absolute liability. It's absolute duty. So we should be able to look at the plaintiff's conduct. That's not what the Illinois Supreme Court tells us. Those are not the words the court used in Tankersley. And Union Pacific quotes this in their reply brief at page 37, where the Tankersley court says, when discussing the issue of subsidence liability, it talks about it being unfair in certain circumstances for the miner to be, quote, absolutely liable for damages. Absolutely liable for damages. Those are the words of the Supreme Court. The cases outside of Illinois are the same. The London case, the St. Louis-San Francisco railroad case. London says, we state the obvious. We state the obvious. Defenses relating to the plaintiff's conduct are not allowed. Union Pacific says, well, but what of the weight of the building cases? And it cites the Wilms case. We heard about it today. Donk and Morris. Weight of the building. Based on the undisputed evidence from the experts, the weight of the building case, summary judgment was entered. By agreement. By agreement. And Wilms said, quote, the mere presence of a building or other structure upon the surface does not prevent a recovery for injuries to the surface. Does not prevent recovery for injuries to the surface unless it is shown that subsidence would not have occurred except for the presence of the buildings. Except for the presence of the buildings. Sole cause. We just heard from Union Pacific that if the building is a cause, that's not the law. Wilms said, we're going to let you talk about the building. We'll let you talk about that conduct. If it's the sole cause. If it's the sole cause. There were no questions of fact on the affirmative defense. The summary judgment was appropriate. On the cross appeal, as with the causation issue, all three experts agreed that if the school district is to improve this property in the future, if it's to build again in the future, grouting is required. The mine voids need to be filled. Undisputed. Union Pacific may take and will take issue with how much it costs, whether it's betterment, but the issue of does that evidence go to the jury is one that's clear in Illinois law, but the trial court said, no, it's not going to be allowed because you didn't build your school there, your new school. True enough, the new school was built in the neighboring community in Gillespie. But the land is still damaged. The land is undisputedly damaged. And the cases we cite in the briefs, Your Honor, make it very clear that in Illinois, the decision about betterment and how much of a recovery is available as a result of this damage is for the jury. I would respectfully request that the court affirm the decisions of liability in favor of the school district and reverse on the cross appeal on the sole issue of damages. And, Your Honor, I would like to reserve my remaining time for rebuttal on the cross appeal. Thank you, Judge. I think you should address that now. I'm going to bounce back and forth. Well, I'm not sure what counsel is going to say, Your Honor. The only thing that I would want to add on the cross appeal is on grouting. The cases, there's whelms, a party liable for subsidence is to account as to the land, as to the damage to the land. The issue of betterment, there's been, I believe, five cases cited to the court on betterment, three by Union Pacific, and every one of them says it's for the jury to decide the extent of betterment, if any. And then I would like to point out to the court that it was a long time ago, but in 1924, this court, the Fourth District, addressed the issue of grouting in a subsidence case, the Gunlock case. This court said that the trial court was appropriate when it told the jury that it would, quote, take into consideration the filling of cracks and the restoration of the premises in determining the amount of damages suffered by the plaintiff. Now, it's 2015. That was in 1924. But the concept of grouting was certainly approved by the court. This court... Except that case has no precedential value. Well, it's persuasive authority. Thank you, Your Honors, unless there's further questions. Thank you, Kevin. Thank you for your time. I'm just going to take a minute on grouting. When you read that 1924 case, they're not talking about grouting, they're not talking about filling in. All the way underneath, they were talking about exhuming some of the cracks, packing it with clay, and then putting soil back on. And the fact of the matter is that the court specifically said that it was too uncertain and too expensive, and they were not going to order that that be done. So I think if you read that case, that's not going to give you the right to grouting. They started out with a school and an ungrouted plot of land, and very unfortunately, despite all wisdom and all the opportunity they had to learn it, they put the school on top of the ungrouted land. Now, at the present time, the damages give them a new school and give them their ungrouted land restored to a flat surface with the remains of the old school demolished. Anything more than that would indeed be a betterment that the law doesn't call for. With respect to law of the case, the fact of the matter is you can find cases that go every which way, but what is indisputable, and you take the Patterson case, for instance, what is indisputable is that this court has the authority. It is not bound by the law of the case doctrine. That is the general prudential doctrine, it's called, to take a look at this case, given the new facts, given that Pilate now has clarified the scope of the cause of action under Section 94, or now 12.80, and under the fact that the Dukes case was the result of this court's hard research after the rehearing, and we had not really had the opportunity to address it until now. All of those are reasons for dispensing with law of the case and looking at the underlying issue to get at what is most important, and that is the intent of the parties, which is basically indisputable. They're counseled. And look, to the extent that this resolution is viewed as a contract, and the contractual language interpretation rules do clearly apply. It was mutual in the sense that it was CNW and Superior Coal. Those were the two parties. Mr. Trotman worked for both, and he was working for both at the time that he put together that memo. And the idea that a seven-page detailed legal analysis never went anywhere, nobody ever saw it, that despite the fact that their Harvard-educated lawyer had done that research, they went on willy-nilly without the benefit of counsel is just nonsense. I mean, and the fact is, if you look at the... There's a memo from his boss, the general counsel, to Ben Heineman, who was the CEO, the head of the board, saying, you've asked us to look into the subsidence. Well, I've talked to Mr. Trotman and Mr. Morehouse, one of the chief financial people, and we've concluded, based on all the analysis, that you should go forward with this transaction. And then Mr. Trotman was charged with drafting the resolution. So the idea that they utterly disregarded their legal advice, never looked at it, I think just makes no sense whatsoever. Again, reformation, it's the same thing. The three elements, intent, mutuality, and fact, well, we've addressed mutuality, but there are cases in Illinois that say if the document is a unilateral document, a unilateral mistake clearly established can be corrected. And the fact versus law issue I've already discussed at some length. I did find it interesting that there was so much emphasis placed on the total different population of the two boards of directors in light of the alter ego arguments, but apart from pausing to observe that, I'm not going to take any more time on that. I think basically the cases before this court, now with a fully developed record, and this court can, on its own because of the length of this litigation, enter judgment either on the assumption of liabilities for us or on the reformation for us. And I would ask you to affirm on the cross. Thank you very much. Thank you, counsel. I take the matter under advisement. Recess for lunch.